# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

JEROME P. JOYCE,

        Plaintiff,

v.

NANCY A. BERRYHILL
in her official capacity as
ACTING COMMISSIONER OF THE
SOCIAL SECURITY ADMINISTRATION,

        Defendant.

No. 16-cv-11891-RGS

---

**REPORT AND RECOMMENDATION ON PLAINTIFF JEROME P. JOYCE'S MOTION TO REVERSE OR REMAND THE DECISION OF THE COMMISSIONER (Dkt. No. 14), AND ON DEFENDANT'S MOTION FOR AN ORDER AFFIRMING THE DECISION OF THE COMMISSIONER (Dkt. No. 18)**

CABELL, U.S.M.J.:

        Jerome P. Joyce ("the plaintiff" or "Joyce") moves to reverse or remand a final decision by the Commissioner of Social Security ("the Commissioner")[1] denying his application for Social Security Disability (SSD/Title II) benefits. (Dkt. No. 14). The Commissioner cross-moves to affirm its decision. (Dkt. No. 18). After careful consideration of the record, and as discussed below, I find the plaintiff's arguments to be without merit. I therefore recommend that the plaintiff's motion to reverse or remand be DENIED, and that the Commissioner's motion to affirm be GRANTED.

---

[1] When this case was originally filed, Carolyn W. Colvin was the Commissioner of Social Security. Since then, Nancy A. Berryhill has succeeded her as Acting Commissioner of Social Security. Pursuant to Fed. R. Civ. P 25(d), Berryhill is automatically substituted as the defendant.

I.   **PROCEDURAL HISTORY**

On December 16, 2013, Joyce filed an application for disability insurance benefits (DIB).  (Dkt. No. 11-2, p.21).[2]  On April 25, 2014, the Social Security Administration (SSA) denied the application, and then denied it again after the plaintiff requested a reconsideration, on August 28, 2014.  (Id.).  On September 5, 2014, the plaintiff filed a request for a hearing before an Administrative Law Judge (ALJ).  (Id.).  The ALJ held the hearing on December 2, 2015.  (Id.).  On January 20, 2016, the ALJ found that the plaintiff was not disabled as of the date last insured.  (Id. at 34).  The plaintiff appealed, and the Appeals Council affirmed the ALJ's decision on August 1, 2016, making that decision the Commissioner's final decision.  (Id. at 2, 7).  On September 16, 2016, the plaintiff initiated this action challenging the denial of his benefits.  (Dkt. No. 1).

II.  **FACTS**

a. **The Plaintiff's Personal and Employment History**

Joyce was born in 1958.  (Dkt. No. 11-6, p.2).  He graduated from high school and subsequently became a licensed low voltage electrician.  (Dkt. No. 11-2, p.51-52).  According to the testimony of a vocational expert (VE), Joyce was a protective signal

---

[2] Citations to the record will first be to the specific docket and attachment number (here, Dkt. No. 11-2).  Then, within each PDF attachment, page citations will be to the court stamped page number at the top of the PDF (here, 21 (of 105)) rather than to any other internal numbering system.

installer, considered a "skilled" job, and performed it at the medium exertional level. (Id. at 87).

### b. **The Plaintiff's Relevant Medical Treatment**

Because Joyce was only insured for DIB purposes through December 31, 2011, the success of his application depended on his being able to demonstrate that he was disabled as of that date. Joyce contended that his onset date of disability was much earlier, on September 1, 2010, so most of the litigation below revolved around the plaintiff's treatment during the period September 1, 2010 to December 31, 2011. The parties appear to agree that this time period remains the relevant time period for purposes of this court's review. Accordingly, the court focuses primarily on that time period (as the ALJ did as well), noting other relevant treatment or evidence outside the time period as appropriate. Broadly speaking, Joyce received treatment in three areas, to address (1) psychiatric issues, (2) sleep-related problems, and (3) physical pain.

### 1. Psychiatric Treatment

Joyce received psychiatric treatment at various times, albeit not during the relevant time period. Many years prior to the relevant period, Joyce received psychiatric treatment from December 1997 through April 1999 at Lahey Clinic, following his wife's stroke in 1996. (Dkt. No. 11-14, p.43-60, 62-65, 67-78; Dkt. No. 11-2, p.60). Those notes are largely illegible but it

appears that Joyce was treated for major depressive disorder ("MDD"). (Dkt. No. 11-14, p.43). The final notes in 1999 indicate that the "MDD [had] improved." (Dkt. No. 11-14, p.78). The record does not reveal any other psychiatric treatment from 1999 through the relevant period ending in December 2011.

In terms of treatment after the relevant time period, the record reflects a mental health evaluation in 2015. On June 7, 2015, Joyce saw psychologist Dr. Einat Grunfeld on a referral to assess depression. (Dkt. No. 11-13, p. 32). The notes indicate that Joyce had also been treated for MDD in 2003, but there are no supporting records from that time period. (Id.). Dr. Grunfeld indicated a diagnostic impression of MDD recurrent, moderate-severe. (Id. at 33). Dr. Grunfeld referred Joyce to Dr. Neil Weiser, a psychiatrist, and on June 24, 2015, Dr. Weiser diagnosed a depressive disorder, not otherwise specified, and assigned a global assessment of functioning of 63. (Id. at 39-41).

### 2. Sleep Treatment

Joyce suffered from sleep problems and in 2007 was referred to an otolaryngologist for treatment. (Dkt. No. 11-11, p.126). In May of 2007 a sleep study revealed that he suffered from severe sleep apnea. (Id. at 124). Joyce was treated throughout 2008 for sleep apnea, including through use of a CPAP[3] machine.

---

[3] CPAP stands for Continuous Positive Airway Pressure.

Unfortunately, while the CPAP was effective, Joyce was unable to tolerate the treatment. (Id. at 108, 110-111).

Joyce subsequently underwent sinus surgery in 2009. The surgery dramatically improved his sleep apnea, and a postoperative study seven weeks later showed only mild obstructive sleep apnea. (Id. at 62, 74, 99-103; Dkt. No. 11-9, p.57). However, multiple follow up visits throughout the year indicate that Joyce continued to be symptomatic. (Dkt. No. 11-9, p.48, 57; Dkt. No. 11-11, p.86-87, 95-96).

Joyce continued to be symptomatic as of September 2010. It was noted that he possibly had persistent obstructive sleep apnea, but that he was also noncompliant with and unable to tolerate CPAP. (Dkt. No. 11-8, p.131; Dkt. No. 11-9, p.48; Dkt. No. 11-11, p.62, 66). In October 2010, Joyce had a severely abnormal sleep test. (Dkt. No. 11-8, p. 118). Consequently, in November 2010, his doctor suggested he would benefit from CPAP and Joyce agreed to reinitiate treatment. (Dkt. No. 11-9, p.44; Dkt. No. 11-11, p.58). In December 2010 Joyce had another sleep test which indicated that CPAP was effective at relieving all of the obstructive events. (Dkt. No. 11-9, p.38; Dkt. No. 11-11, p.49).

In March of 2011 it was noted that Joyce had been using an auto CPAP machine and was tolerating it fairly well. (Dkt. No. 11-11, p.35). In August of 2011, Joyce's doctor noted that Joyce's obstructive sleep apnea was stable due to his excellent compliance

with his CPAP machine. (Dkt. No. 11-9, p.11; Dkt. No. 11-11, p. 18-19). In November 2011 his doctor noted that Joyce was compliant with his auto CPAP but nonetheless continued to have excessive sleepiness, and did not feel any more alert during the day. (Dkt. No. 11-8, p.135; Dkt. No. 11-11, p.2, 8).

### 3. Pain Treatment

Joyce suffered from migraines, beginning in his 30s and continuing for about a decade (i.e., the 1980s). (Dkt. No. 11-11, p.37, 54, 60, 64; Dkt. No. 11-9, p.30, 41). He began suffering from migraines again in September 2010, when he began to have three to five migraines per month. (Dkt. No. 11-9, p.39; Dkt. No. 11-11, p.37). When the migraines became worse at the end of 2010 and into 2011, Joyce was prescribed Topamax. (Dkt. No. 11-8, p.138; Dkt. No. 11-9, p.39; Dkt. No. 11-11, p.41, 51, 53, 55-56). The Topamax seemed to control Joyce's symptoms reasonably well and his condition greatly improved by March 2011. (Dkt. No. 11-9, p.39; Dkt. No. 11-11, p.11).

Joyce also suffered from low back pain. As of January 2011, Joyce claimed to have suffered from the condition for five years, and he complained then of a flare of right sided pain and decreased strength in the right leg and hip, although the symptoms were not considered alarming. (Dkt. No. 11-9, p.35; Dkt. No. 11-11, p.45, 48). He was given a lidocaine patch and by June 2012 his back pain was considered to be an intermittent issue. (Dkt. No. 11-

11, p.48; Dkt. No. 11-8, p.114).

Joyce also experienced periodic abdominal pain. Following a clinical examination and colonoscopy, he was diagnosed with diverticulitis in July 2010. (Dkt. No. 11-11, p.60, 67-68, 70; Dkt. No. 11-9, p.50-51, 53-54).

Finally, in October 2011 Joyce visited a doctor complaining of increased pain in both feet bilaterally, stating that over the last few years the pain had been getting increasingly worse. Several years earlier, in 2002, Joyce had been diagnosed with bilateral hallux rigidus related to pain in his big toe. (Dkt. No. 11-9, p.4). Physical examination and x-rays showed bone spurs and a moderate amount of osteoarthritis. (Id. at 5).

### c. (Non-agency) Medical Opinion Evidence

Joyce saw many different professionals over the course of several years. Two in particular provided opinions that are relevant here. Dr. Michael C. Berarducci, the plaintiff's long-time treating physician, opined in 2015 that the plaintiff, based principally on *physical* ailments, is disabled and had been unable to work since 2008. Given the timing, Dr. Berarducci presumably offered his opinion in support of the plaintiff's administrative hearing before the ALJ.

Dr. Herbert Golub, a psychologist, evaluated the plaintiff in 2014; it is unclear how the plaintiff came to see him, although it is presumed it too was in anticipation of the hearing before the

ALJ.  Dr. Golub concluded that the plaintiff suffers from major depressive disorder.

### 1. Dr. Berarducci (Lahey Clinic): Treating Source Opinion

Dr. Berarducci was the plaintiff's primary care physician both before and after his date last insured (December 31, 2011), and he wrote a treating source statement, on March 19, 2015. (Dkt. No. 11-12, p.102-103).  Dr. Berarducci reported that Joyce had "systemic illness with fatigue, arthralgias and generalized weakness," "migraine headaches and depression dating back many years and likely before 2001," and "depression and ongoing symptoms including emotional lability and difficulty working with people." (Id. at 102).  He also reported that Joyce suffered "from recurrent arthritis and fevers on a weekly basis," "obstructive sleep apnea" "severe daytime somnolence," "severe fatigue during the day" and a lack of alertness because of it.  (Id.).  Dr. Berarducci also noted that Joyce had severe low back pain due to degenerative disc disease, and severe neck pain due to "severe central canal stenosis at C4-5." (Id.).  Dr. Berarducci concluded:

> In summary, Mr. Joyce has a number of serious medical problems impairing his ability to work. He has been unable to work since 2008. I would consider him totally disabled. I do not feel he can participate in any meaningful work at this time. He is unable to concentrate. His physical limitations include being unable to sit or stand for more than 20 minutes at a time without difficulty. His cervical spine stenosis makes it difficult for him to use his hands.

(Id.).

### 2. Herbert Golub, Ph.D.: Psychological Testing and Evaluation

Dr. Golub was not one of the plaintiff's treating physicians. Rather, he evaluated the plaintiff on December 23, 2014, for diagnosis clarification, treatment recommendation, and an assessment of residual functioning. (Dkt. No. 11-12, p.93). Dr. Golub was able to obtain and review records from the Lahey Clinic which spanned from 2001 through December 2014, but these records related primarily to physical problems; the plaintiff claimed to have been seen by a mental health person at Lahey at some point in the past but no such records were able to be found. (Dkt. No. 11-12, p.94).

Dr. Golub found that the plaintiff had high average to above average intelligence, but noted that there were "evident, at least mild, memory problems." (Id. at 96). He noted that Joyce was easily upset and agitated, quite self-critical, and extremely insecure. (Id.). He also noted that Joyce appeared to have a high level of "free-floating anxiety." (Id.). Dr. Golub stated that there were no suggestions of evident psychosis but he saw the plaintiff "as a man who was overwhelmed by his life, namely his losses, his wife's illnesses, his own decompensated self, and his inability to work." (Id. at 97).

Dr. Golub noted that Joyce's WAIS-IV[4] results had "a wide range of skills and deficiencies, quite typical of individuals who might have substantial psychiatric and/or neurological/physical problems." (Id. at 97). As such, he found that Joyce's "residual intellectual ability is considered to be higher ... than his measured memory skills." (Id.). Dr. Golub also observed that Joyce's "memory functioning and various emotional/characterological areas seem to be significantly impaired." (Id. at 98). Dr. Golub also found that Joyce appeared to have decompensated quite remarkably emotionally, to the level of individuals with no more than below average level intelligence and who are no more than early adolescents. (Id. at 99). He found that Joyce's depression "seemed to be quite well established." (Id.). Ultimately, Dr. Golub found that the plaintiff had "very limited residual functional skills." He opined that the level of Joyce's "disabling condition" traced back several years, to 2010 or earlier. He concluded that Joyce's prognosis for significant improvement was "quite poor" without appropriate treatment. (Id. at 100).

Lastly, Dr. Golub also reviewed Joyce's medical records related to prior mental health treatment. (Dkt. No. 11-12, p.94; Dkt. No. 11-14, p.98). Dr. Golub noted that records from Lahey Clinic from 2001 through 2014 indicated that Joyce was treated for

---

[4] WAIS-IV stands for Wechsler Adult Intelligence Scale-Fourth Edition. It is an IQ test designed to measure intelligence and cognitive ability in adults and older adolescents.

a multitude of physical problems. (Dkt. No. 11-12, p.94). Dr. Golub noted that Lahey medical staff in 2002 indicated a diagnosis of major depressive disorder, but noted that this diagnosis was not given by mental health staff. (Dkt. No. 11-12, p.94). Dr. Golub gleaned several psychiatric symptoms from these records, including a sleep disorder, irritability, 'declining mood,' and problems with concentration, motivation, and tenseness. In addition, chronic fatigue and anhedonia were said to be characteristic and several anti-depressants had been prescribed. (Id.). Dr. Golub characterized the plaintiff's prior mental health treatment as "fleeting, and not significant." (Id. at 96). He noted that Joyce had only a few sessions in the 90s and in 2003/2004, and was never put on any medication. (Id.). After reviewing additional records dating over the past twenty years, Dr. Golub concluded that major depressive disorder was likely present then and throughout Joyce's working career. (Dkt. No. 11-14, p.99).

### d. Other Evidence

The plaintiff also submitted a 2014 letter from a former co-worker, Michael Sirois. Sirois described his observation of the plaintiff's condition through 2008. He stated that Joyce cared for his wife and young daughter in the 1990s while maintaining a high level of functionality in his professional work. He noted that by the early 2000s the plaintiff was stressed out, suffering

from migraines, and depressed. He also noted that Joyce's personality changed, that he appeared burned out, that he complained of pain in his feet and neck, had trouble sleeping, and consequently was often sluggish at work. In Sirois's view, the plaintiff's pace, persistence, and concentration were markedly impaired by 2008. (Dkt. No. 11-6, p.39).

### e. State Agency Medical Opinion Evidence

Several state agency professionals reviewed the plaintiff's file and offered opinions as to whether he was disabled. Two professionals offered opinions in connection with his initial application for benefits and, after it was denied, two more offered opinions in connection with his request for a reconsideration.

Regarding the plaintiff's initial application, Bich Duong, M.D., a non-examining state agency physician, opined on April 23, 2014 that Joyce's physical impairments were non-severe through the date last insured. (Dkt. No. 11-3, p.6). As to his mental health, Lawrence Fieman, Ed.D., a non-examining state agency psychologist, opined on April 24, 2014 that there was no mental medically determinable impairment established before the date last insured. (Id. at 7). Dr. Fieman also noted that there were no psychology-related documents in the medical records and no psychological diagnosis prior to the date last insured. (Id.).

The SSA denied the plaintiff's initial application just after receiving these opinions, on April 25, 2014.

With respect to the plaintiff's request for reconsideration of his application, Henry Astarjian, M.D., a non-examining state agency physician, opined on August 19, 2014 that the plaintiff, as of the date last insured, retained the ability to lift and/or carry 20 pounds occasionally and 10 pounds frequently, sit and stand and/or walk for six hours in an eight-hour workday, and push and/or pull without limitation. (Id. at 15-16). Dr. Astarjian further opined that the plaintiff could frequently climb ramps and stairs, kneel, crouch, crawl, occasionally climb ladders/ropers/scaffolds, stoop, and balance without limitation. (Id. at 16).

Also on August 19, 2014, Menachem Kasdan, Ed.D., a non-examining state agency psychologist, found that the plaintiff had no mental medically determinable impairments. (Id. at 14-15). Dr. Kasdan also noted that there were no psychology-related documents in the medical records and no psychological diagnosis prior to the date last insured. (Id.).

### f. The Administrative Hearing Before the ALJ

Following the denial of the request for reconsideration, the plaintiff requested an administrative hearing, which the ALJ convened on December 2, 2015. (Dkt. No. 11-2, p.21).

#### 1. The plaintiff's testimony

The plaintiff testified at the hearing and, in general, testified to suffering several physical ailments while trying at the same time to care for his wife and manage the household.

Among other things, the plaintiff testified that his wife had a stroke in 1996 and that he alone cared for her and his daughter. (Id. at 62). He stated that he began suffering from migraine headaches in 1996/1997, and that they progressively worsened each year. (Id. at 63). He stated that in 2010 his migraines became intense and he was treated with Topomax. (Id. at 64-66). The medication reportedly helped but there were side effects, including impaired speech. (Id. at 66). The plaintiff testified that he suffered a migraine per month and each would last into the next day. (Id. at 67).

The plaintiff also testified that he had problems with standing, gripping with his hands, and moving his neck. (Id. at 73-75). He also testified that he had sleep apnea going back to 2007, longstanding back pain that came and went, and pain in his left toe that he could not treat through surgery for fear he would not be able to care for his wife if off his feet for a period. (Id. at 75-79).

The plaintiff stated that since 2010, he cared for his wife, took care of the house, cleaned, cooked, and performed maintenance. (Id.). He also reported that he drove, but not at night because of poor vision. (Id. at 81).

## 2. Vocational expert

A vocational expert was asked to consider the work capacity of an individual who: was limited to occasional climbing of ladders, ropes, and scaffolds; needed to avoid concentrated exposure to hazards, including dangerous moving machinery and unprotected heights; could understand, carry out, and remember simple and detailed instructions; and could have brief superficial interactions with the general public, co-workers, and supervisors. (Id. at 87-88). The vocational expert testified that such an individual could perform the light work of packaging and inspector, and the medium work of packaging and assembler. (Id. at 88-89). The vocational expert added that an individual who was additionally limited to light work with frequent climbing of stairs and ramps, occasional climbing of ladders, ropes, and scaffolds, occasional stooping, and frequent kneeling, crouching, and crawling could perform the light work identified (Id. at 89).

### g. **The ALJ's Findings**

On January 20, 2016, the ALJ found that the plaintiff was not disabled from September 1, 2010, through the date last insured (December 31, 2011). (Dkt. No. 11-2, p.21, 34). The ALJ noted that disability is defined as "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has

lasted or can be expected to last for a continuous period of not less than 12 months." (Dkt. No. 11-2, p.21). The ALJ noted that to satisfy the insured status requirements of the Social Security Act, the claimant must establish disability on or before the date last insured. (Id.). The ALJ applied the required five-step evaluation process in determining that the plaintiff did not meet this standard. (Id. at 22).

Step one considers whether the plaintiff is engaging in substantial gainful activity ("SGA"), because a claimant who is so engaged is not disabled. 20 CFR § 416.920(b). SGA is defined as work activity done for pay that involves doing significant physical or mental activity. 20 CFR § 416.972(a). The ALJ found that the plaintiff had not engaged in SGA from his alleged onset date of September 2010 through his date last insured of December 31, 2011, and therefore moved on to step two. (Dkt. No. 11-2, p.23).

Step two considers whether the plaintiff suffers from one or more impairment(s) that would be considered severe as defined by the pertinent regulations. 20 CFR § 416.920(c). Relevant here, the ALJ found that the plaintiff did have some severe impairments through the date last insured, including degenerative disc disease of the lumbar spine, obstructive sleep apnea, and migraines, but determined that the plaintiff's psychological limitations did not constitute a severe impairment. (Id.).

In making the finding that the plaintiff's mental impairments

were not severe, the ALJ gave greater weight to the opinions of the state agency mental health consultants, noting that they were specifically empowered to make judgments regarding whether a person has the severity of symptoms required to meet or equal conditions found under the medical Listings in 20 CFR 404.1527(f)(1). (Id.). The ALJ noted that the medical records during the period supported the opinion of the state agency consultants. (Id.). While the records showed that the plaintiff received mental health treatment on and off prior to the alleged onset date of disability, the ALJ noted that Dr. Berarducci, one of the claimant's treating physicians, reported that his neurological and psychological systems were within normal limits in September 2011. (Id. at 25).

The ALJ also considered the opinion of Dr. Herbert Golub, the psychologist who evaluated Joyce in 2014 and opined that he had likely suffered from major depressive disorder for several years, but ultimately gave little weight to his opinion, because it was inconsistent with the medical treatment that the claimant actually sought and received during the relevant period. (Id.). She noted that multiple treatment notes from the relevant period indicate that Joyce was bright, alert, articulate, and fully oriented, and on multiple occasions claimed no neurological or psychological issues. (Id.).

The ALJ further noted that Dr. Grunfeld, the claimant's

treating psychologist in 2015, indicated that the plaintiff had several years earlier been treated with Wellbutrin in 2003, and found it to be helpful. (Id.). Joyce also told Dr. Grunfeld that he did not receive any mental health therapy and stopped taking the medication after he felt better. (Id.). The ALJ noted that Dr. Grunfeld did not find any evidence of psychosis, and that Dr. Grunfeld's findings suggested that the plaintiff's psychological condition had not been significantly limiting given that he was able to care for his wife since she became disabled in the 90s. (Id.).

Finally, the ALJ also considered the four broad functional areas set out in the disability regulations for evaluating mental disorders, and in section 12.00C of the Listing of Impairments, also known as the Paragraph B criteria. (Id.). In the first functional area, "daily living," the ALJ noted that the plaintiff had no limitations. (Id.). In the second functional area, "social functioning," the ALJ found that the plaintiff had mild limitations. (Id.). She noted that while he maintained a good relationship with his wife and daughter, he had difficulty being around other people. (Id.). The ALJ also found mild limitations in the third functional area, "concentration, persistence, and pace." (Id. at 26). She noted that the plaintiff testified that he had difficulty concentrating, but also stated that he had been, and continued to be, the primary caregiver for his wife. (Id.).

The ALJ noted that it was unlikely that Joyce would have been able to care for his wife and at the same time have severe limitations in this area. (Id.). She did note that Dr. Golub assigned a global assessment of functioning rating of 45, which indicates serious symptoms or impairments in social, occupational, or school functioning. (Id.). However, she also noted that Joyce's ability to care for his disabled wife, and lack of mental health treatment and complaint prior to the date last insured, were inconsistent with that opinion. (Id.). The ALJ concluded that the claimant had no more than mild limitations in this area. The fourth functional area is "episodes of decompensation," and the ALJ found that Joyce had not experienced any such episodes. (Id.). In sum, the ALJ determined that because the plaintiff's medically determinable mental impairment caused no more than mild limitation in any of the first three areas, and effected no episodes of decompensation in the fourth area, any mental impairment the plaintiff may have had was non-severe. (Id.).

But, because the ALJ as noted above determined that the plaintiff did otherwise have severe impairments relating to degenerative disc disease of the lumbar spine, obstructive sleep apnea, and migraines, she moved on to step three.[5]

_____

[5] In addition to the severe impairments the ALJ did find, she also considered a myriad of other physical issues for which the plaintiff was treated, but determined these to be non-severe, or non-determinable medical impairments during the period at issue. She noted that the plaintiff was also treated for hypertension, hyperlipidemia, rosacea/actinic keratosis, diverticulitis,

Steps three, four and five operate in tandem. Step three requires the ALJ to consider whether the plaintiff's impairments taken together are severe enough to meet or medically equal the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1. 20 CFR §§ 416.920(d), 416.925, and 416.926. If so, the claimant is conclusively presumed to be disabled. If not, one moves to step four to consider whether the applicant's residual functional capacity ("RFC") allows him to perform his past relevant work. If the claimant is capable of performing past relevant work, he is not disabled. If the claimant's RFC in step four does not allow him to perform his past relevant work, the burden shifts to the Commissioner in step five to prove that the claimant "is able to perform other work in the national economy in view of [the claimant's] age, education, and work experience." 20 C.F.R. §§ 404.1520(a)(4)(iii-v).

Here, the ALJ concluded at step three that the plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in

---

erectile dysfunction, and osteoarthritis of the large toes. (Id. at 24). The ALJ determined that these impairments were non-severe because there was little evidence that these impairments resulted in more than minimal limitation on Joyce's ability to perform his work-related activities. (Id.). The ALJ also noted that the plaintiff's medical records contained evidence of treatment for persistent left knee and neck pain, and irregular astigmatism of the eyes, but noted also that these issues occurred many years after the date last insured. (Id.). She also noted that the plaintiff's vision problems did not hinder his ability to drive or perform other visual activities such as caring for his disabled wife, and in fact resolved in 2010. (Id.).

20 CFR Part 404, Subpart A, Appendix 1. (Id. at 26). The ALJ explained that, although the claimant had impairments that were considered severe, they were not attended, singly or in combination, with the specific clinical signs and diagnostic findings required to meet or equal the requirements set forth in the Listing of Impairments. (Id.). She also noted that no treating or examining physician indicated any such findings.[6] (Id.).

As required, the ALJ then proceeded to step four to determine whether the plaintiff nonetheless lacked the RFC to perform his past relevant work. The ALJ found that the plaintiff had the RFC to perform medium work as defined by 20 CFR § 404.1567(c). (Dkt. No. 11-2, p.27). The ALJ found that the claimant's medically determinable impairments were likely to cause the physical symptoms alleged, but that Joyce's "statements concerning the intensity, persistence and limiting effects of these symptoms [we]re not entirely credible…." (Id. at 28). After a thorough

---

[6] To be clear, the ALJ did consider Listing 1.04, disorders of the spine. She noted that while the medical records showed the presence of degenerative disc disease, they did not show evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis. (Id. at 26-27). She also considered the claimant's sleep apnea under section 3.10, noting that the symptoms from sleep apnea are evaluated under section 3.09, which deals with pulmonary artery pressure. (Id. at 27). She noted that in order to meet that listing, the claimant must have either cor pulmonale caused by chronic pulmonary vascular hypertension, or severe cognitive impairment caused by lack of sleep. (Id.). The ALJ noted that the records indicated that the plaintiff's sleep apnea significantly improved after surgery in 2009 and with the use of a sleep-aid machine. (Id.). As such, she found that his sleep apnea did not meet or equal the impairments in this listing. (Id.).

review of the medical evidence, the ALJ concluded that the evidence pertaining to the plaintiff's physical health revealed essentially normal findings during the period at issue. (Id. at 29). Nonetheless, giving him the benefit of the doubt, she assigned a limitation to medium work with postural restrictions. (Id. at 30).

Regarding the plaintiff's sleep disorder, the ALJ noted that the record did not support the severity or frequency of episodes he alleged. (Id.). She noted that the treatment notes prior to the date last insured indicated that his neurological and sleep apnea symptoms and limitations were not as severe as alleged, and found the credibility of his allegations of the severity of his sleep deficiency and headaches to be diminished because they were greater than expected in light of the objective evidence of the record. (Id.).

The ALJ gave partial weight to the opinion of Dr. Astrarjian, who opined that the plaintiff suffered from degenerative disc disease but could still perform light work with some postural limitations. (Id.). The ALJ noted that Joyce had been the primary caregiver for his disabled wife for the past twenty years, and found that his ability to do so meant that he was able to perform at least medium exertion tasks during the relevant period. (Id. at 31). Conversely, the ALJ gave no weight to the opinion of Dr. Berarducci, the claimant's treating physician, because his opinion

was not only inconsistent with his own examination findings during the relevant period, but also inconsistent with the plaintiff's ability to be his disabled wife's primary caregiver. (Id.).

After considering all of the evidence, the ALJ, as noted, concluded that the plaintiff was capable of performing medium work with some limitations during the relevant period.

That being said, the ALJ concluded that the plaintiff was not able to perform any past relevant work pursuant to 20 CFR § 404.1565, based principally on the vocational expert's testimony that a hypothetical person with the plaintiff's relevant characteristics would not be able to perform the plaintiff's past relevant work as a Protective Signal Installer. (Id. at 30-31).

The ALJ thus turned to step five, which puts the burden on the Commissioner to prove that the claimant is still "able to perform other work in the national economy in view of [the claimant's] age, education, and work experience." 20 C.F.R. §§ 416.912(g) and 416.920(c). The ALJ found that although the plaintiff was not able to perform any past relevant work through the date last insured, there were jobs that existed in significant numbers in the national economy that the claimant could perform. (Id. at 32). The ALJ concluded that Joyce therefore was not under a disability as defined by the Social Security Act as of the date last insured. (Id. at 33).

III. **DISCUSSION**

The plaintiff argues that the ALJ committed two reversible errors. He argues first that the ALJ improperly ignored evidence supporting a disability based on mental health, and instead substituted her own lay conclusion to the contrary. Presumably, the plaintiff argues that the ALJ erred at step two when she determined that his mental health related issues did not constitute a severe impairment. The plaintiff argues also that the medical evidence was ambiguous as to the onset date of his disability, and the ALJ therefore erred when she failed under SSR 83-20 to consult with a medical expert to resolve the ambiguity.

The Commissioner argues that there was substantial evidence to support the ALJ's determination that the plaintiff's psychological limitations did not amount to a severe impairment. The Commissioner also argues that SSR 83-20 is not implicated on the facts of this case and, even assuming it were, it was not necessary to consult a medical expert because the medical evidence regarding onset disability was not ambiguous.

a. **Standard of Review**

A court reviews the findings of an ALJ only to determine whether the findings are supported by substantial evidence, and whether the correct legal standard was applied. *Teague v. Colvin*, 151 F. Supp. 3d 1, 2 (D. Mass. 2015). Substantial evidence to support a decision exists if "a reasonable mind, reviewing the

evidence in the record as a whole, could accept it as adequate to support his conclusion." *Id.* This Court must keep in mind when applying this standard of review that it is the role of the ALJ, and not this Court, to find facts, decide issues of credibility, draw inferences from the record, and resolve conflicts of evidence. *Ortiz v. Secretary of Health and Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991). This Court may affirm, modify, or reverse the ALJ's decision, but reversal is only warranted if the ALJ made a legal or factual error in evaluating the plaintiff's claim, or if the record contains no "evidence rationally adequate … to justify the conclusion" of the ALJ. *Roman-Roman v. Commissioner of Soc. Sec.*, 114 Fed. Appx. 410, 411 (1st Cir. 2004). This Court therefore must affirm the ALJ's decision if it is supported by substantial weight, even if the record could arguably support a different conclusion. *Evangelista v. Secretary of Health and Human Servs.*, 826 F.2d 136, 144 (1st Cir. 1987).

### b. <u>Analysis</u>

1. <u>The ALJ did not Err in Concluding that the Plaintiff's Psychological Limitations did not Constitute a Severe Impairment</u>

The plaintiff argues that the ALJ, in considering whether his mental health limitations constituted a severe impairment, ignored relevant medical evidence, in particular the favorable opinion of Dr. Golub. The plaintiff argues that the opinions of the state agency reviewers, Dr. Kasdan and Dr. Fieman, who opined that he

was not suffering from a mental impairment, merited little weight because those experts did not have sufficient information before them to opine regarding his mental health limitations, and the ALJ as a practical matter simply relied on her own lay assessments of the claimant's psychological limitations, based largely on unjustified inferences she drew from evidence that he was able to relate to his family members and take care of his severely disabled wife. The plaintiff intimates that had the ALJ properly considered the evidence and found his mental limitations to be severe, she might have subsequently determined that he was disabled.

This court discerns no error in the ALJ's treatment of this issue. To begin, an ALJ must "always consider the medical opinions in [the] case record." 20 C.F.R. § 404.1527(b). Notwithstanding the plaintiff's contention that the ALJ failed to do so, the record reflects that the ALJ properly fulfilled her obligation to consider all the evidence. In particular, the record demonstrates that the ALJ devoted significant attention to allegations that the plaintiff suffered from depression. She noted that in June 2012 the plaintiff confided in his doctor that he was suffering great stress, and that the doctor referred him to behavioral medicine for anxiety and possible depression. She noted that while the record showed that the plaintiff received mental health treatment on and off prior to the alleged onset date, Dr. Berarducci, his treating physician, reported that his neurological and

psychological systems were within normal limits in September 2011 (during the relevant period).  The ALJ also noted that additional records indicated that he was bright, alert, articulate, and fully oriented, and on multiple occasions he claimed no neurological or psychological issues.

The ALJ also did consider Dr. Golub's opinion, notwithstanding the plaintiff's claim to the contrary.  While it is true that Dr. Golub opined that the plaintiff had most likely been suffering a major depressive disorder for several years, the ALJ explained that she gave his opinion little weight because she found it to be inconsistent with the medical treatment the claimant actually sought during the relevant period, and also inconsistent with the plaintiff's treating psychologist's opinion, which indicated that while the plaintiff was treated with Wellbutrin in 2003, he stopped taking the medication after he felt better and did not receive mental health therapy.  Even assuming reasonable minds might disagree with the ALJ's weighing of the evidence and ultimate conclusion, these decisions were hers to make based on the record before her.  *See Sexton v. Barnhart*, 247 F. Supp. 2d 15, 24 (D. Mass. 2003) (while physician opined that claimant could not work, "that conclusion is reserved to the Commissioner, not the treating physician;" physician's opinion was undercut by treatment notes, and was inconsistent with other medical reports).

Similarly, the ALJ did not err in giving greater weight to

the opinion of the state agency reviewers, Dr. Kasdan and Dr. Fieman. Indeed, "the ALJ must consider findings of State agency medical and psychological consultants as opinion evidence because such individuals are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation." *Id.* at 25. (internal quotation and alteration marks omitted). The ALJ certainly was not obligated to accord greater weight to the state agency reviewers' positions, but she explained that she did so because their opinions were consistent with and supported by the medical records from the relevant period. The ALJ's decision to accord them greater weight for this reason was sound and thus wholly proper. *See e.g., Bourinot v. Colvin,* 95 F. Supp. 3d 161, 175 (D. Mass. 2015) (The ALJ may give greater weight to the medical opinions of non-treating physicians so long as there is good reason to do so).

In short, the record reflects that the ALJ fulfilled her obligation to review all of the available medical evidence, based her conclusions on that evidence, and explained how and why she accorded each opinion the weight she did. Accordingly, there is no basis to question her determination that the plaintiff's mental health limitations did not constitute a severe impairment. *See Pinnick v. Colvin*, 132 F. Supp. 3d 18, (D. Mass. 2015) (ALJ did not err in giving little weight to medical opinion or substitute his own opinions for medical evidence where the ALJ found medical

opinion at issue to be inconsistent with the record as a whole, cited specific findings in the medical records, and referenced the opinion of the state agency consulting physicians).

<blockquote>2. <u>The ALJ did not Err in Failing to Consult a Medical Expert Under SSR 83-20 to Determine Disability Onset Date</u></blockquote>

The plaintiff contends that the ALJ erred in failing to properly apply SSR 83-20, which he asserts required her to consult a medical expert to determine the date of the onset of his disability. SSR 83-20 describes the relevant evidence to be considered when establishing the onset date of disability, and provides among other things that "[the ALJ] should call on the services of a medical advisor when onset must be inferred." SSR 83-20, 1983 WL 31249.

Historically, courts in this district have taken the view that SSR 83-20 does not apply unless a finding of present disability has already been made. *See Hartigan v. Colvin*, No. CIV.A. 13-10540-TSH, 2014 WL 3849965, at *5 (D. Mass. Aug. 4, 2014); *Silverio v. Astrue*, No. CIV.A. 10-40202-FDS, 2012 WL 996857, at *6, *7 (D. Mass. Mar. 21, 2012); *McDonald v. Astrue*, No. CIV.A. 10-10896-DPW, 2011 WL 3562933, at *10 (D. Mass. Aug. 15, 2011); *see also Duncan v. Colvin*, No. 1:15-cv-00393-JHR, 2016 WL 5477567, at *3 (D. Me. September 28, 2016). Under this approach, the ALJ's failure to consult a medical expert in this case would not present an issue because no finding of present

disability had been made.

More recently, however, it has been suggested (but not outright held) that the better course might be to consult a medical expert whenever the medical evidence regarding onset date is ambiguous, even if there has not been a finding of present disability. *See Fischer v. Colvin*, 831 F.3d 31, 36-39 (1st. Cir 2016); *see also Mazonson v. Colvin*, Civil Action No. 15-cv-12979-ADB, 2016 WL 6776280, at *8 (D. Mass. November 15, 2016) (finding that "[i]t would be contrary to the spirit of the Social Security Act and unreasonably rigid to hold that… the protections of SSR 83-20 do not apply where an ALJ has not had occasion to determine the claimant's present disability status.").

Assuming without deciding that SSR 83-20 applies here, this court still finds no merit in the plaintiff's claim of reversible error. Under SSR 83-20, the "starting point" for determining the onset date of a disability of "nontraumatic origin" is the claimant's own "statement as to when disability began." SSR 83-20, 1983 WL 31249 (1983). The ALJ's task is then to determine whether the alleged onset date is consistent with the evidence in the case. *Field v. Shalal*, No. CIV 93-289-B, 1994 WL 485781, at *3 (D.N.H. Aug. 30, 1994). "Medical evidence serves as the primary element in the onset determination." SSR 83-20. Medical evidence is ambiguous where there is at least some evidence that would allow the ALJ to infer that the alleged onset date is accurate, but the

claimant's medical records do not provide a precise onset date for his disability. *Warneka v. Colvin*, No. 14-CV-00022-PB, 2015 WL 1470955, at *3 (D.N.H. Mar. 31, 2015); see also *Rossiter v. Astrue*, No. 10-CV-349-JL, 2011 WL 2783997, at *2 (D.N.H. July 15, 2011) (evidence regarding onset was such that a reasonable person could have decided either way and was therefore ambiguous such that medical expert should have been called).

However, it is not necessary to consult a medical expert if the alleged onset date is contradicted by contemporaneous medical evidence. *Field*, 1994 WL 485781, at *3 ("To reject [claimant's] alleged date, the ALJ must determine that it conflicts with the other evidence in the record); *Derosier v. Astrue*, No. 08-274-B-W, 2009 WL 961508, at *6 (D. Me. April 7, 2009) (report and recommendation adopted, No. CIV 08-274-B-W, 2009 WL 1259114 (D. Me. May 5, 2009) (plaintiff cannot create ambiguity in medical evidence by offering a retrospective medical opinion that is contradicted by contemporaneous medical evidence).

The plaintiff argues that because there were no mental health records from the relevant time period, and because the only opinion evidence available regarding the plaintiff's mental health came from Dr. Golub, it means that Dr. Golub's opinion was not contradicted by any available medical records, and that there was at least some evidence to allow the ALJ to infer that the onset date was September 2010 as claimed. Accordingly, so the plaintiff

31

argues, the ALJ should have called a medical expert regarding the disability onset date.

In this court's view, though, it is hard to find fault with the ALJ's failure to consult a medical expert. While there was a dearth of evidence during the relevant time period bearing on the onset date of a mental health related disability, this is not a case where there was no evidence from the relevant time period; there was plenty of evidence, just no mental health related evidence. True, Dr. Golub's 2014 retrospective opinion is the only medical evidence in the record regarding mental health from which an inference concerning the onset date of the plaintiff's depression could be drawn, but the ALJ gave ample reason for according his opinion little weight. Absent his opinion, then, there was simply no evidence that would allow the ALJ to infer that the alleged onset date was accurate. It follows that the medical evidence was not ambiguous, and there was thus no need to consult a medical expert pursuant to SSR 83-20. *See Derosier,* 2009 WL 961508 at *5.

Even assuming for the sake of argument that the ALJ should have consulted a medical expert, remand still would not be appropriate. *See Mazonson v. Colvin*, No. 15-cv-12979-ADB, 2016 WL 6776280, at *9 (D. Mass. November 15, 2016) (noting that "while an error of law by the ALJ may necessitate a remand, a remand is not essential if it will amount to no more than an empty exercise.")

(internal alteration marks omitted).  Here, remand would be an exercise in futility.  While *Joyce* argues that the state agency reviewers "admitted to lacking any information with which to establish a diagnosis or an assessment," that is not inconsistent with Dr. Golub's statement.  Indeed, Dr. Golub noted that the plaintiff's mental health treatment was "fleeting" and "not significant," and that the records regarding treatment Joyce did receive were "remote."  Dr. Golub did not reference any treatment or records beyond the year 2004, let alone from the relevant period.  At any hearing on remand the medical expert would be in the same position and presented with the same evidence as the non-examining state agency reviewers, who already opined on the plaintiff's mental health condition.  Testimony from another medical expert on this issue would merely be duplicative of those opinions.  *See Mazonson* at \*9.  Additionally, and as already noted, the ALJ explained why she assigned less weight to the opinion of Dr. Golub, as well as that of the plaintiff's former co-worker, noting that they contradicted the evidence in the medical records.  *See id.*  The ALJ should not be required to go through such an empty exercise by remanding to call a medical expert.  Accordingly, even assuming for the sake of argument that the ALJ's failure to comply with the requirement of SSR 83-20 to call a medical expert was error, it was harmless.  *See id.*

## IV. __CONCLUSION__

For the foregoing reasons, it is respectfully recommended that the plaintiff's motion to reverse or remand the decision of the Commissioner be DENIED (Dkt. No. 14). It is further recommended that the Commissioner's motion to affirm be GRANTED (Dkt. No. 18). The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72(b), any party who objects to these proposed findings and recommendations must file specific written objections thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made and the bases for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Fed. R. Civ. P. 72(b), will preclude further appellate review of the District Court's order based on this Report and Recommendation. *See Keating v. Secretary of health and Human Services,* 848 F.2d 271 (1st Cir. 1988); *United States v. Emiliano Valencia-Copete*, 792 F.2d 4 (1st Cir. 1986); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603 (1st Cir. 1980).

/s/ Donald L. Cabell
DONALD L. CABELL, U.S.M.J.

DATED: August 31, 2017